# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**WILLIE D. SMITH**
                **Plaintiff,**

        **v.**                                           **Case No. 07-C-0955**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
                **Defendant.**

## DECISION AND ORDER

Plaintiff Willie Smith seeks judicial review of the denial of his application for social security disability benefits. Plaintiff claimed that he was unable to work due to diabetes and resulting complications, but the Social Security Administration ("SSA") rejected his claim, as did an Administrative Law Judge ("ALJ") after a hearing. Upon review of the record I find no reversible error and thus affirm the ALJ's decision.

## I. APPLICABLE LEGAL STANDARDS

### A.    Judicial Review

Judicial review of a social security determination is limited to determining whether the ALJ's decision is supported by "substantial evidence" and consistent with applicable law. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence must be more than a scintilla but may be less than a preponderance. Skinner v. Astrue, 478 F.3d 836, 844 (7th Cir. 2007). When reviewing for substantial evidence, the court may "not displace the ALJ's

judgment by reconsidering facts or evidence or making credibility determinations." Id. Thus, where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, the responsibility for that decision falls on the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997).

Although the substantial evidence standard is deferential, the ALJ's decision must be sufficient to assure the court that she considered the important evidence, Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996), and built an accurate and logical bridge between the evidence and the result, Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996). Further, errors of law, such as failure to abide by the SSA's regulations and rulings for evaluating disability claims, see Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991), generally require reversal "without regard to the volume of evidence in support of the factual findings," White v. Apfel, 167 F.3d 369, 373 (7th Cir. 1999). However, even an error of law, if harmless, will not permit the reviewing court to upset the ALJ's decision. Sanchez v. Barnhart, 467 F.3d 1081, 1082-83 (7th Cir. 2006). Such errors are harmless if, even under the proper legal standards, there is no reasonable possibility of a different result on remand. See Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003).

B.    **Disability Standard**

The SSA has adopted a sequential five-step test for determining whether a claimant is disabled.  Under this test, the ALJ must determine: (1) whether the claimant is presently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether any of the claimant's impairments are listed

2

by the SSA as being presumptively disabling;[1] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform his past work; and (5) if not, whether the claimant is able to perform any other work. Skinner, 478 F.3d at 844 n.1.

The claimant carries the burden of proof at steps one through four, but if he reaches step five, the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy. Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004). The SSA may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of his limitations, or through the use of the "Medical-Vocational Guidelines" (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. The ALJ may not rely on the Grid and must consult a VE if non-exertional limitations (e.g., pain, or mental, sensory, postural or skin impairments) substantially reduce the claimant's range of work, although she may use the Grid as a "framework" for her decision. E.g., Masch v. Barnhart, 406 F. Supp. 2d 1038, 1041-42 (E.D. Wis. 2005).

## II. FACTS AND BACKGROUND

The SSA denied plaintiff's applications (Tr. at 52; 421) initially and on a request for reconsideration (Tr. at 20; 21; 26; 31; 411; 417 ). Plaintiff then requested a hearing (Tr. at 25), and on April 2, 2007 he appeared with counsel before ALJ Margaret O'Grady (Tr. at 37; 40; 435).

---

[1] These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").

3

## A.     Hearing Testimony

### 1.     Plaintiff

Plaintiff testified that he was forty years old, unmarried with no children, and lived with his mother. (Tr. at 438.) He stated that he graduated high school but completed no additional education (Tr. at 439) and previously worked for a meat packing company and as a school bus driver (Tr. at 440-41). He indicated that he had no current income and relied on his mother for financial support and GAMP for his medical needs. (Tr. at 442.)

Plaintiff testified that he took various medications for his diabetes, which caused side effects of dizziness, nausea and weakness. (Tr. at 442-43.) He stated that on a typical day he watched TV, read and laid down. He indicated that he could care for his personal needs but did no housekeeping chores. (Tr. at 443.) He stated that he went to church every Sunday; occasionally socialized with friends, shooting pool or watching movies; and exercised, performing five sets of fifty pushups five days a week. (Tr. at 444-45.)

Plaintiff testified that he was unable to work due to pain in his feet and legs, hands, wrists and arms, but admitted that he received no treatment for this pain. (Tr. at 447-49.) He also stated that his legs cramped and hurt during prolonged sitting, he had trouble handling objects, and his eyes hurt from reading. (Tr. at 451-52.) He testified that he underwent laser eye surgery in February 2007 but continued to have blurred vision. (Tr. at 454.) He stated that he could stand in one spot for about one hour, and lift and carry about eleven pounds. (Tr. at 456.)

### 2.     VE

The VE, Beth Hoynik, classified plaintiff's past work as a bus driver as medium semi-

4

skilled work, and as a meat packer as medium, unskilled work.  (Tr. at 457-58.)  The ALJ then asked a series of hypothetical questions.  The first assumed a person forty years old, with a high school education, and vocational history like plaintiff's, limited to medium work with no climbing, balancing, working at heights or with hazards, and occasional crouching.  The VE testified that such a person could not perform plaintiff's past work as a meat cutter but could work as a bus driver.  (Tr. at 458-59.)  The second question changed the exertional category to light, which eliminated the bus driver job.  (Tr. at 459.)  However, the VE identified other jobs that could be done at the light and sedentary levels under the hypothetical, such as packaging and production work, and electrical assembly.  (Tr. at 459-60.)  The VE testified that if the person needed a sit/stand option the sedentary jobs would not be affected.  (Tr. at 460.)  If the person could use his hands on a frequent but not constant basis, the jobs could still be done.  (Tr. at 460.)  If the person had to work with larger objects not requiring fine visual acuity, the electrical assembly work would be eliminated but the packaging and general production work would remain.  (Tr. at 461.)  However, if the person were limited to occasional use of the hands, all of the identified jobs would be eliminated.  (Tr. at 461.)  Likewise, if the person missed more than four days of work per month, no work would be available.  (Tr. at 461-62.)

## B.    Treatment Records

On December 31, 2002, plaintiff was admitted to St. Francis Hospital after fracturing his mandible in a fall and found to be in significant diabetic acidosis with severe dehydration.  He underwent a closed reduction of the fracture and was treated with an insulin drip and IV fluids and released on January 6, 2003.  (Tr. at 101-13.)  On February 13, 2003, the doctor removed the hardware from the mandible surgery without complications.  (Tr. at 133.)

Plaintiff returned to St. Francis on September 17, 2004, with an ulcerative wound to his

5

right foot. Although plaintiff had been diagnosed with diabetes over a year and a half ago, he had received no treatment for about six months due to lack of insurance and was at the time homeless. Dr. Alok Goyal admitted plaintiff and started him on IV antibiotics. (Tr. at 141-43; 146-48.) The on-call surgeon, Dr. Anilkumar Singh, performed a debridement of plaintiff's infected, necrotic right foot. (Tr. at 144.) Dr. Goyal discharged plaintiff on September 18 with oral antibiotics and other medications, and referred him to the Salvation Army Clinic (Tr. at 139-40), where he received insulin until his GAMP insurance kicked in (Tr. at 163-73). Thereafter he received treatment for his diabetes at St. Ben's Clinic (Tr. at 272-74; 331-36) and St. Mary's Hospital (Tr. at 257-71; 337-64). The records from those two providers reveal that plaintiff's diabetes was irregularly controlled, that he felt dizzy and weak when his blood sugars were out of range, and that his compliance with his medication regimen was somewhat spotty. (E.g., Tr. at 268; 270; 274; 344; 345.)

On January 5, 2005, plaintiff saw Dr. John Krebsbach at the Foot and Ankle Health Center, complaining of worsening right foot ulcer. Dr. Krebsbach debrided the foot and applied gel and sterile bandaging. (Tr. at 249.) Plaintiff returned to Dr. Krebsbach on January 24, and the doctor noted that MRI testing revealed osteomyelitis of the fifth metatarsal head.[2] (Tr. at 248; 288-89.) On February 14, Dr. Krebsbach operated on plaintiff's right foot at St. Mary's Hospital related to the diagnosis of osteomyelitis with chronic ulcer of the right foot. (Tr. at 177-96; 220-22; 282-83.) Plaintiff progressed well post-operatively (Tr. at 247; 246; 244; 245), but on April 13 returned with a complaint that his fifth metatarsal head was thickened, reddened and swollen. Dr. Krebsbach debrided the area and applied cream and sterile bandage. (Tr.

---

[2]Osteomyelitis is inflammation of the bone marrow and adjacent bone. Stedman's Medical Dictionary 1284 (27th ed. 2000).

6

at 243.)  Plaintiff's condition again improved with this treatment and after he was fitted for custom orthotics.  (Tr. at 242; 241; 240; 239.)  Plaintiff continued seeing Dr. Krebsbach for further debridements throughout the summer and fall of 2005.  (Tr. at 398-400; 394-97.)

In May 2005, plaintiff underwent cardiac testing at St. Mary's, which revealed moderate left ventricular hypertrophy (Tr. at 213-15; 276-78), but the record contains no evidence of further treatment for this condition.  On June 27, 2005, plaintiff was evaluated by Dr. Paul Mandel regarding his complaints of blurred vision, and Dr. Mandel diagnosed mild background diabetic retinopathy with macular edema, uncorrected refractive error and elevated intraocular pressure.  (Tr. at 255.)  Dr. Mandel also referred plaintiff to Dr. John DeCarlo, who provided glasses and eye drops.  (Tr. at 294.)

On October 13, 2005, plaintiff's treating nurse practitioner at St. Ben's Clinic, Carol Sejda,  completed a diabetes medical assessment form, in which she indicated that plaintiff suffered from type 2 diabetes, osteomyelitis of the right fifth toe, left foot ulcers, mild retinopathy and intermittent claudication (i.e., limping, see Stedman's Medical Dictionary 360). (Tr. at 326.)  She indicated that he could walk three to four blocks, sit about fifteen minutes and stand about one hour at one time, and  sit and stand/walk about two hours in an eight hour day. She opined that he would have to take about ten unscheduled breaks during an average work day and would be absent more than four days per month based on his impairments.  (Tr. at 327-28.)  She wrote that he experienced mild pain in the hands, feet and ankles, which would occasionally interfere with concentration and attention, and that he experienced dizziness and weakness as side effects of medication.  (Tr. at 328.)  She stated that he could occasionally lift ten pounds, rarely twenty, but never more, and that he could use his hands and arms for grasping, manipulating and reaching only 20% of the workday.  Finally, she opined that plaintiff

7

made poor choices about his healthcare and recommended that he receive psychological testing to evaluate his memory, decision-making and intellectual functioning. (Tr. at 329.)

Dr. Krebsbach continued treating plaintiff's foot ulceration from November 2005 through January 2007. (Tr. at 376-393.) On February 9, 2007, Dr. Krebsbach performed an osteotomy of the fifth metatarsal of plaintiff's left foot. (Tr. at 366-67.) Dr. Krebsbach's records from February and March 2007 indicate that he recovered normally. (Tr. at 373-375.)

## C.    SSA Consultants

On March 1, 2005, plaintiff underwent a consultative exam with Dr. Daniel Jankins. Plaintiff reported numbness in his feet but stated that he could walk up to ½ mile without much difficulty. He was taking insulin and other medications and reported no allergic reactions. He reported no problems with the use of his hands. (Tr. at 200.) On examination, plaintiff had full range of motion of the neck, extremities and spine, was able to get up onto and off the exam table, and could perform heel-to-toe ambulation. Dr. Jankins's impression was that plaintiff had a history of diabetes and some mild peripheral neuropathic symptoms, and was almost healed from his significant right foot ulcer. He continued to require antibiotics, but Dr. Jankins believed this to be temporary. Dr. Jankins noted that plaintiff's most unfortunate issues appeared to be his transitory living situation; however, plaintiff did have GAMP to obtain his medications. (Tr. at 201.)

On March 31, 2005, Dr. Pat Chan completed a physical RFC report for the SSA, opining that plaintiff could perform medium work with no postural, manipulative, visual, communicative or environmental limitations. (Tr. at 203-10.) On August 11, 2005, another consultant completed a physical RFC report, which also found plaintiff capable of medium work with no other limitations. (Tr. at 304-11.) Finally, on August 12, 2005, Keith Bauer, PhD, completed

8

a psychiatric review technique form for the SSA, concluding that plaintiff had no severe mental impairment. (Tr. at 312-25.)

## D. ALJ's Decision

On June 21, 2007, the ALJ issued an unfavorable decision. The ALJ determined that plaintiff had not engaged in substantial gainful activity since his alleged onset date, and that he suffered from severe impairments – chronic skin ulcer, diabetes, osteomyeltis, retinopathy, claudication, myopathy, left ventricular hypertrophy, left ventricular neuropathy and mandible fracture – but that none of these impairments met or equaled a Listing. (Tr. at 14-15.) At step four, the ALJ concluded that plaintiff retained the RFC for sedentary work allowing for alternating between sitting and standing, and not involving climbing, balancing, heights or hazards. (Tr. at 16.) Based on this RFC, the ALJ concluded that plaintiff could not return to his past work but, relying on the testimony of the VE (and using Grid Rules 201.28 and 201.29 as a framework), concluded that plaintiff could perform other jobs such as packer/packager and production worker. (Tr. at 17-18.) Therefore, she found plaintiff not disabled and denied the application. (Tr. at 18-19.) Plaintiff sought review by the Appeals Council (Tr. at 423-25), but on September 19, 2007, the Council denied his request (Tr. at 5).[3] This action followed.

## III. DISCUSSION

Plaintiff argues that the ALJ improperly evaluated (1) the opinion of his treating nurse practitioner, Carol Sejda; (2) his mental impairment; (3) the credibility of his testimony; (4) the Listings; and (5) his ability to perform a significant number of jobs at step five. I address each

---

[3]Plaintiff submitted additional medical records to the Council, including a report from a St. Ben's nurse practitioner and a letter from Dr. Daniel Ferguson regarding his laser eye surgery. (Tr. at 427-34.)

9

argument in turn.

**A.   Nurse Practitioner's Report**

   **1.   Legal Standard**

The SSA reviews opinions from a claimant's medical professionals differently based on the source of the report.   Opinions from the claimant's treating physician (a/k/a "treating source") are entitled to "special consideration."   <u>Dominguese v. Massanari</u>, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001).   If such an opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent" with other substantial evidence the ALJ must afford it "controlling weight."   20 C.F.R. § 404.1527(d)(2).

However, in order to be considered a "treating source" the medical provider must be an "acceptable medical source."   20 C.F.R. 404.1502.   Acceptable medical sources include physicians, psychologists, optometrists, podiatrists and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).   Medical personnel such as nurse practitioners, physician's assistants and therapists are not acceptable medical sources; rather, they are considered "other sources" under SSA regulations.   20 C.F.R. § 404.1513(d).   Information from other sources cannot establish the existence of a medically determinable impairment.   However, the SSA may rely on other source reports to determine the severity of the claimant's impairments and how they affect his ability to function.   SSR 06-03p.   The SSA recently acknowledged:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.   Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects,

10

along with the other relevant evidence in the file.

SSR 06-03p.

SSR 06-03p directs ALJs in evaluating other source reports to consider how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment(s); and any other factors that tend to support or refute the opinion. SSR 06-03p. The Ruling further explains:

> The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because . . . "acceptable medical sources" "are the most qualified health care professionals." However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.
> . . .
> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p.

11

### 2.    Analysis

As discussed above, in her October 2005 report NP Sejda imposed significant restrictions on plaintiff's ability to work (Tr. at 326-29), which would appear to eliminate all competitive employment (Tr. at 461-62).   The ALJ summarized Sejda's report as follows:

> It was opined that claimant could sit for about two hours and stand/walk for about two hours in an eight-hour day.  It was noted the claimant could occasionally lift 10 pounds.  It was noted the claimant made poor choices regarding healthcare and had not always taken medication as prescribed.

(Tr. at 15.)  The ALJ later rejected the report, stating that it:

> is not supported by the evidence (Exhibit 20F).  The claimant is able to socialize with friends, shoot pool and take a City bus to attend appointments as needed.  He also reported doing 250 pushups, five days per week.  Claimant has had flare-ups of the ulcers and undergone procedures but has improved within short time periods.

(Tr. at 16.)

Plaintiff argues that the ALJ's evaluation of the report was cursory and consisted of just three sentences.  However, he mentions only the ALJ's summary of the report on page 15 of the record, not her analysis of it contained on page 16.  Therefore, the ALJ did not fail to provide reasons for her rejection of the report, as plaintiff claims.  Nor did she reject the report simply because its author was not an acceptable medical source.  And, while the ALJ's explanation for her rejection of this report could have been more thorough, as the opinion of an "other source" I cannot conclude that the ALJ was required to say more.  See Masch, 406 F. Supp. 2d at 1056 (upholding ALJ's rejection of nurse practitioner report where the ALJ compared the report to the other evidence in the record and reached a reasonable conclusion).

Plaintiff argues that the ALJ selectively discussed the report, but there is no requirement that the ALJ exhaustively summarize the record.  See, e.g., Smith v. Apfel, 231 F.3d 433, 444

12

(7th Cir. 2000) (stating that "the ALJ is not required to evaluate in writing every piece of evidence submitted," but need only consider the important evidence such that the court can trace the path of her reasoning). Plaintiff also complains that the ALJ improperly credited the portion of Sejda's report discussing his "poor choices regarding healthcare." However, the ALJ did not deny the application based on non-compliance with treatment that could have restored his ability to work. Thus, her failure to explicitly address Sejda's belief that a mental impairment may be the cause of plaintiff's non-compliance was, at most, harmless error. Cf. SSR 82-59 (discussing procedures when the claimant has failed to follow prescribed treatment that would restore his ability to work, including the requirement that the ALJ consider whether such failure is justifiable).[4]

Finally, the reasons the ALJ provided are supported by substantial evidence and generally consistent with the SSR 06-03p factors. Plaintiff points to no treatment records from Sejda or any other provider supporting the severe restrictions contained in the October 2005 report;[5] nor does he demonstrate that he and Sejda enjoyed a regular and ongoing treatment relationship, such that her report should carry greater weight.[6] Therefore, the ALJ committed

_____

[4]Plaintiff notes that the ALJ failed to re-contact Sejda, but he provides no authority for such a requirement when the source is not a treating source. See Masch, 406 F. Supp. 2d at 1056.

[5]Perhaps the most significant limitation in the Sejda report impacting on plaintiff's ability to perform sedentary work is on the use of his hands. (Tr. at 329.) However, the record does not appear to contain treatment notes supporting such restrictions, and plaintiff told consultant Dr. Jankins that he "does not have any problems with the use of his hands." (Tr. at 200.)

[6]The Commissioner claims that plaintiff submitted an inconsistent report from NP Sejda to the Appeals Council. However, it appears that the report given the Council was drafted by a different provider at St. Ben's Clinic, Sara Zirbel, RN, MSN, ANP. (Tr. at 433.) In any event, the additional evidence submitted to the Appeals Council is not properly before me. See Rice v. Barnhart, 384 F.3d 363, 366 n.2 (7th Cir. 2004) (stating that the court may not consider

13

no reversible error in her evaluation of NP Sejda's October 2005 report.

**B.     Mental Impairment**

      **1.     Legal Standard**

When the claimant alleges disability due to a mental impairment, the ALJ must apply a "special technique" in evaluating the claim. 20 C.F.R. 404.1520a(a). Under this technique, the ALJ first considers whether, under the "A criteria" of the Listings, the claimant has a medically determinable mental impairment.[7] § 404.1520a(b)(1). If so, the ALJ must under the "B criteria" rate the degree of functional limitation resulting from the impairment. § 404.1520a(b)(2). The B criteria have four components: activities of daily living ("ADLs"); social functioning; concentration, persistence or pace; and episodes of decompensation. § 404.1520a(c)(3). The ALJ rates the degree of limitation in the first three areas using a five-point scale: none, mild, moderate, marked and extreme, and the degree of limitation in the fourth (episodes of decompensation) using a four-point scale: none, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. § 404.1520a(c)(4). On the other hand, if the ALJ rates the degree of limitation as "none" or "mild," she may generally find that the claimant has no severe mental impairment. § 404.1520a(d)(1). The regulations require the ALJ to document her application of this technique and include a specific finding as to the degree of limitation in each of the functional areas in her decision. § 404.1520a(e)(2).

_____

evidence which was not before the ALJ, but which was later submitted to the Appeals Council).

    [7]The paragraph A criteria substantiate medically the presence of a particular mental disorder.

14

### 2.    Analysis

The ALJ did not find any severe mental impairment in plaintiff's case.  Plaintiff contends that the ALJ skipped the portion of NP Sejda's report recommending psychological testing. Plaintiff also points out that he told the SSA in a medical treatment form that a Salvation Army nurse name Teri recommended that he go to a psychiatric clinic (Tr. at 91), and that on a different form he wrote that he received psychiatric treatment from a Dr. Hall (Tr. at 98). However, plaintiff neglects to mention that on the same form he stated, "Dr. Hall told me that diabetes cause [sic] mental depression which I don't have mental depression and I didn't take no [sic] medications for that.  She didn't think I needed any treatment for mental depression." (Tr. at 98.)

It is true, as plaintiff contends, that the ALJ has a duty to fully and fairly develop the record, even when the claimant is represented by counsel.  But it is also true that the claimant bears the burden of presenting adequate medical evidence to support his claim.  Scheck, 357 F.3d at 702.  In this case, plaintiff presented no medical evidence demonstrating a severe mental impairment.  Nevertheless, the SSA engaged a psychological consultant, Dr. Bauer, who reviewed the record and found that plaintiff had no limitations under the B criteria (and thus no severe mental impairment).[8]  (Tr. at 312-25.)  Further, at the hearing the ALJ asked plaintiff (several times) to explain the reasons why he was unable to work (Tr. at 447; 451; 452), and he said nothing about a mental impairment.  Nor did plaintiff's counsel explore the

---

[8]Plaintiff argues in his reply brief that the ALJ erred by not specifically discussing Dr. Bauer's report, as required by SSR 96-6p, but remand for further consideration of a report contrary to plaintiff's claim will not lead to a different result.  See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

issue. See Glenn v. Secretary of Health and Human Services, 814 F.2d 387, 391 (7th Cir. 1987) ("When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits."). Plaintiff is thus left to argue that the ALJ should have picked up on the notation at the end of NP Sejda's report and done more to develop the record. He asks too much. See Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir. 1993) ("When reviewing proceedings conducted by others, district judges must respect the authority of administrative officials to decide how much is enough."). I find no reversible error in the ALJ's treatment of this issue.

## C. Credibility

### 1. Legal Standard

The reviewing the court must defer to the ALJ's credibility determination because she had the opportunity to personally observe the claimant's demeanor at the hearing. Windus v. Barnhart, 345 F. Supp. 2d 928, 945 (E.D. Wis. 2004). Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong." Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003). However, the ALJ must comply with the requirements of SSR 96-7p in evaluating credibility. Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir.2003).

SSR 96-7p establishes a two-step process for evaluating the claimant's testimony and statements about symptoms such as pain, fatigue or weakness. First, the ALJ must consider whether the claimant suffers from a medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. If not, the symptoms cannot be found to affect the claimant's ability to work. SSR 96-7p.

Second, if an underlying impairment that could reasonably be expected to produce the

16

claimant's symptoms has been shown, the ALJ must determine the extent to which the claimed symptoms limit the claimant's ability to work. If the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record. SSR 96-7p. The "ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995). Rather, this is but one factor to consider, along with the claimant's daily activities; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication the claimant takes; treatment other than medication; any other measures the claimant has used to relieve the pain or other symptoms; and functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. While the ALJ need not discuss all of these factors in checklist fashion, she must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning. Windus, 345 F. Supp. 2d at 946.

### 2. Analysis

In the present case, after setting forth the SSR 96-7p standards (Tr. at 16-17), the ALJ found that plaintiff suffered from impairments that could cause the alleged symptoms, but that his statements about the intensity, persistence and limiting effects of those symptoms were "not entirely credible" (Tr. at 17). In making this determination, the ALJ considered the medical evidence, including the improvement in plaintiff's condition after he started checking his blood sugar and taking his medication more regularly, and the improvement of his ulcers with treatment; his daily activities, including socializing with friends, shooting pool, taking the bus

17

to appointments, managing his own personal care, performing some household chores and doing 250 pushups five days per week; and the correction of his vision with eyeglasses. The ALJ concluded: "Overall, when the claimant's complaints and allegations about his limitations and impairments are considered in light of the objective medical evidence and all of the above noted factors, they do not reflect an individual who is so impaired as to be incapable of engaging in any substantial gainful work activity." (Tr. at 17.)

Plaintiff first argues that the ALJ did not explicitly discuss all of the SSR 96-7p factors, but that is not required. Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1030 (E.D. Wis. 2004) (citing Clay v. Apfel, 64 F. Supp. 2d 774, 781 (N.D. Ill. 1999)). Plaintiff further contends that the ALJ failed to explain how his daily activities, punctuated by bed rest, proved dishonesty. But the ALJ was not required to accept the notion that plaintiff had to lie down several hours per day, as plaintiff testified was part of his daily routine. (Tr. at 443.) Further, the ALJ did not entirely discount plaintiff's complaints of fatigue, weakness and dizziness; indeed, she limited him to sedentary work with a sit-stand option and no climbing, balancing, heights or hazards. (Tr. at 16.) Likewise, the limitation to sedentary work reasonably accommodated any problems plaintiff had with walking due to his foot lesions.

Plaintiff next argues that the ALJ failed to consider lack of insurance as an explanation for his lack of treatment. However, the record demonstrates that plaintiff received treatment at the Salvation Army Clinic during his period of un-insurance, and that after his GAMP insurance kicked in he received regular treatment for his diabetes at St. Ben's Clinic (Tr. at 272-74; 331-36) and St. Mary's Hospital (Tr. at 257-71; 337-64).[9] Therefore, I see no reason

---

[9]The record thus shows that plaintiff was able to obtain treatment after his alleged onset date of November 1, 2004. (Tr. at 438.)

18

why the ALJ should have explored this issue. Plaintiff also contends that the ALJ misstated the evidence about the improvement of his vision with treatment, but the ALJ specifically excluded jobs that would require "fine, small, visual acuity" (Tr. at 461), instead finding him capable of performing jobs "working only with large objects" (Tr. at 18).

In sum, the ALJ's credibility determination generally complied with applicable regulations and rulings, and was not patently wrong. Therefore, I find no reversible error on this issue.

## D.   Listings

### 1.   Legal Standard

The claimant bears the burden of producing evidence demonstrating that he meets or equals the specific criteria of a Listing. Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir.1999). In evaluating a claim at step three, the ALJ should mention the specific Listings she is considering; failure to do so, if combined with a perfunctory analysis of the relevant evidence, may require a remand. Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006) (citing Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783, 786 (7th Cir. 2003)).

### 2.   Analysis

In the present case, the ALJ concluded, in summary fashion, that none of plaintiff's impairments met or equaled a Listing. (Tr. at 15.) Plaintiff contends that the ALJ erred in failing to mention any specific Listing and in failing to build a bridge from the evidence to her step three conclusion. Plaintiff notes that Listing 9.08 applies to diabetes mellitus with accompanying disorders such as neuropathy or retinitis proliferans. In this regard, he notes NP Sejda's opinion that he could use his hands only occasionally, and that the ALJ found his retinopathy to be a severe impairment.

19

However, plaintiff makes no showing that he, in fact, meets Listing 9.08, in either his main brief or his rely brief. Instead, he alleges that the ALJ should have more fully evaluated the issue. The Seventh Circuit rejected a similar argument in <u>Sanchez</u>:

> The plaintiff in our case argues that her daughter has asthma so severe as to constitute a "listed impairment." But she challenges the administrative law judge's contrary finding solely on the ground that he failed to explain it adequately. There is merit to the argument and ordinarily it would require a remand. But in administrative as in judicial proceedings, errors if harmless do not require (or indeed permit) the reviewing court to upset the agency's decision. This is such a case. Chila does have asthma, uses a bronchodilator occasionally, and occasionally takes cortisone. For her asthma to rise to the level of a listed impairment, however, there must be medical evidence either of "persistent low-grade wheezing between acute attacks" or of "the absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators." There is no such evidence, as the district court noted and the Social Security Administration's brief explains at length; the plaintiff's reply brief contests neither the district court's finding nor SSA's explanation.

467 F.3d at 1082-83 (internal citations omitted).[10]

Plaintiff further notes that the ALJ failed to discuss Listing 8.00, which applies to skin lesions. But he concedes that his lesions were not "extensive" as required by that Listing. In the absence of some showing that the ALJ might on remand find medical equivalence with some specific Listing, I cannot justify remanding the case. Likewise, absent some showing that remand could lead to a different result, plaintiff fails to demonstrate that the matter should be returned for further evaluation of medical equivalence by a state agency doctor under SSR 96-6p.

_____

[10]I would add that, to the extent NP Sejda's report could be read to support a claim of neuropathy in two extremities, the ALJ rejected that report. Further, as the ALJ noted (Tr. at 15), Dr. Jankins described plaintiff's neuropathic symptoms as mild (Tr. at 201) and Dr. Mandel characterized plaintiff's diabetic retinopathy as mild (Tr. at 255).

20

**E.     Significant Number of Jobs**

Finally, plaintiff argues that because the ALJ failed to fully develop the record or to properly evaluate NP Sejda's report, her conclusion at step five was flawed.  He notes that the VE was able to identify only 1000 jobs under the hypothetical question the ALJ ultimately relied upon, and thus even a small variation in the RFC could have profound implications for plaintiff's claim.   However, for the reasons discussed above, I find no reversible error in the ALJ's development of the record, evaluation of Sejda's report or determination of RFC.

Plaintiff also argues that the ALJ erred in finding 1000 jobs throughout the entire state of Wisconsin to be a significant number.  He states that under Barrett v. Barnhart, 355 F.3d 1065, 1067 (7th Cir. 2004), "the test is whether [he] is so disabled that there are no jobs in reasonable proximity to where [he] lives that [he] is physically able to do."   However, the Seventh Circuit clarified this issue on rehearing in Barrett:

> The government, distressed by one sentence in our opinion in Barrett v. Barnhart, 355 F.3d 1065 (7th Cir. 2004), asks us to change it (the government does not ask us to reconsider our decision, which was adverse to it).  The sentence is: "The test [of the plaintiff's entitlement to disability benefits] is whether she is so disabled that there are no jobs in reasonable proximity to where she lives that she is physically able to do."  355 F.3d at 1067 (emphasis added).  It is the phrase that we have italicized that bothers the government, which points out that the law does not require, to defeat a finding of disability, that jobs exist in the immediate area in which the claimant lives.  42 U.S.C. § 423(d)(2)(A) provides that a person is disabled if he cannot do his previous work or "engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  That is the language the government would like us to substitute.
>
> Yet in our experience, and, it seems, in that of the other circuits as well, the vocational experts who testify in social security disability cases concerning the

21

availability of jobs that the applicant has the physical ability to perform almost always confine their testimony to indicating the number of such jobs that exist in the applicant's state, or an even smaller area. We have found only a few cases in which national numbers alone were cited as a basis for denying benefits. In practice, the principal significance of the "other regions" language in the statute is to prevent the Social Security Administration from denying benefits on the basis of "isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the applicant] live[s]," 20 C.F.R. § 404.1566(b).

Our formulation that the government doesn't like was thus descriptively accurate; it was not intended to alter the statutory standard.

368 F.3d 691, 691-92 (7th Cir. 2004) (internal citations omitted). Thus, Barrett does not stand

for the proposition that, as a matter of law, the jobs identified by the VE must exist within the

claimant's locality. See also Isaacs v. Barnhart, No. 05CV00185, 2006 WL 3240114 (S.D. Ind.

Oct. 13, 2006) (discussing this issue in light of Barrett); Knox v. Barnhart, No. 05CV00155,

2006 WL 3201913 (S.D. Ind. Aug. 22, 2006) (same).

In his main brief, plaintiff argues only that the jobs identified by the ALJ and the VE were

not sufficiently proximate to his home. For the reasons discussed, that argument fails.

However, in his reply brief, plaintiff raises several new arguments on this issue – that the VE's

testimony was speculative, that the VE identified only 800 jobs (not 1000 as the ALJ stated),

and that the ALJ and the VE failed to provide specific examples of jobs. Arguments raised for

the first time in reply are waived. See, e.g., Amerson v. Farrey, 492 F.3d 848, 852 (7th Cir.

2007). Further, plaintiff was represented by counsel at the hearing, and his lawyer certainly

could have challenged the VE to be more specific. Cf. Donahue v. Barnhart, 279 F.3d 441,

446 (7th Cir. 2002) ("When no one questions the vocational expert's foundation or reasoning,

an ALJ is entitled to accept the vocational expert's conclusion[.]"). Finally, plaintiff makes no

persuasive showing that the ALJ did get the numbers wrong (it appears the VE identified 500

22

jobs in packaging <u>and</u> production work, for a total of 1000) or that the total number of jobs was insignificant. Therefore, I can find no reversible error on this point.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 23rd day of March, 2008.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

23